EDWARDS, Judge.
Roy H. Jones was charged by bill of information with public payroll fraud, a violation of LSA-R.S. 14:138(1) and theft, a violation of LSA-R.S. 14:67. After a lengthy jury trial, the defendant was convicted on both counts. Defendant now appeals alleging sixteen assignments of error. For the following reasons, we affirm both convictions and their respective sentences.[1]
In May 1984, Roy Jones was appointed a deputy sheriff by Ronnie Duplantis, Sheriff of Terrebonne Parish, Louisiana. He was not placed on the sheriff’s payroll until July 1, 1984, after his long-time friend, Charlton Rozands, assumed office as the newly elected sheriff in Terrebonne Parish. The defendant was paid approximately $625.00 per month and was listed on the sheriff’s records as having been assigned to the motor pool division. Sheriff’s department records indicated that on January 25, 1985 he was reassigned to the marine patrol division. The defendant received his salary and benefits until Sheriff Rozands died in April, 1987; the defendant was laid off one day after Rozands' burial.
Prior to his death, both Sheriff Rozands and the defendant were indicted on public payroll fraud. These charges were nolle prosequied as to the defendant, and reinsti-tuted by bill of information which included the newly added theft charges.
The defendant was charged with violating LSA-R.S. 14:138.1 which reads:
*1126 Public pay roll fraud is committed when: (1) Any person shall knowingly receive any payment or compensation, or knowingly permit his name to be carried on any employment list or pay roll for any payment or compensation from the state, for services not actually rendered by himself, or for services grossly inadequate for the payment or compensation received or to be received according to such employment list or pay roll; or
[[Image here]]
This charge was based upon allegations that the defendant, although not a full-time deputy, rendered services which were grossly inadequate for his pay. The theft charges stemmed from purchases made with Sheriffs Department credit cards for gasoline and oil purchases during his period of alleged employment as a deputy. These purchases were apparently not related to the performance of his supposed duties as a deputy sheriff.
PAYROLL FRAUD TESTIMONY

State’s Witnesses

The state called numerous witnesses, most of whom were either law enforcement officials or had been so during the time the defendant was a deputy.
Bonnie Duplantis, a supervisor/bookkeeper for the Terrebonne Parish Sheriffs Office, testified that she had been an employee of the sheriffs department for ten years. She was in charge of payroll and the payment of invoices for the sheriffs department. She testified that the defendant was hired on July 1, 1984, and listed on the records as being assigned to the motor pool. On January 25, 1985, the records indicated that the defendant was reassigned to the marine patrol division. Ms. Duplantis testified that the defendant was paid $290.00 every two weeks and that he received twenty-six paychecks per year through December of 1986. For the thirty month period (between July 1, 1984 and December 31, 1986) the defendant received a total salary of $18,850.00. She also testified that the defendant had life and health insurance coverage and that, later, Sheriff Rozands ordered that the defendant also receive hospitalization coverage. She testified that the average pay for a patrolman working a forty hour per week shift during this period of time was $855.00 per month. Finally, she testified that the defendant’s net salary was less than $500.00 per month, after deductions.
David Mosely, an investigator for the Terrebonne Parish District Attorney’s Office, testified that he had been a road patrol deputy from July, 1984, to December, 1986. Before that, he had been a shift supervisor when Ronnie Duplantis was the Sheriff. He testified that he was a lifelong resident of Gibson and that, although he did not know the defendant personally, he had “known of him for about fifteen, twenty years.” Mr. Mosely testified that the defendant had never assisted him while he was on patrol and that he was not aware that the defendant had performed any other duties in connection with the sheriff’s department.
Major Douglas Chauvin testified that he had been employed by the Terrebonne Parish Sheriff’s Office for fourteen years and was in charge of the marine patrol division during Sheriff Rozands’ term of office. He testified that the defendant did not work in marine patrol during this time and that he did not even know the defendant had been assigned to marine patrol until three days after Sheriff Rozands died. Major Chauvin testified that on May 20, 1985, a drilling barge accident claimed eleven lives; but two survivors were rescued. Although the accident occurred thirty to thirty-five minutes travel distance from the defendant’s home, the defendant was not on the scene. Finally, Major Chauvin testified that he had never seen the defendant at the motor pool between July, 1984, and January 25, 1985, and that he was not aware the defendant had been assigned there.
Jerry Larpenter testified that he had been Uniform Division Commander in the Terrebonne Parish Sheriff’s Office from July, 1984, to April, 1987. Upon Sheriff Rozands’ death, he became Acting Sheriff of Terrebonne Parish. Mr. Larpenter testified that he knew of no work done by the *1127 defendant in connection with his employment as a deputy sheriff. He stated that the average patrolman worked forty hours per week and handled an average of three to four complaints per day. On a few occasions, Sheriff Larpenter asked the defendant to patrol a certain area; but he did not know whether or not the defendant complied with these requests. Sheriff Lar-penter testified that he had doubts about whether or not the defendant could handle complaints and arrests. He complained to Sheriff Rozands about the defendant having a patrol unit because there was a shortage of patrol vehicles in the department at one time. However, Sheriff Rozands replied that he had given the defendant a patrol unit and he wanted the defendant to patrol the Gibson area. Sheriff Larpenter testified that he did not know of any complaints called in by the defendant, and he did not perceive any improvement in the defendant’s patrolling after he complained to Sheriff Rozands.
Russell Samanie testified that he was the head mechanic at the motor pool for four years under Sheriffs Duplantis and Ro-zands. He testified that Huey Usie, who supervised the motor pool, and Mr. Barrett, who ran the wrecker service, were the only two employees of the motor pool other than himself. Mr. Samanie testified that he never saw the defendant at the motor pool and did not know that the defendant was assigned there.
Huey Usie testified that he was the head of the motor pool under Sheriff Rozands. He stated that he never saw the defendant at the motor pool between July and December of 1986 and did not know that the defendant was assigned to work there.
Sergeant George Pellegrin testified that he had been employed by the Terrebonne Parish Sheriff’s Department since 1975. Between July, 1984, and December, 1986, he was assigned to the Transportation Department and transported prisoners to various facilities. He testified that he saw the defendant in the motor pool office a few times but did not know what the defendant did at the motor pool. He testified that the defendant never transported prisoners. Finally, he testified that he was familiar with the marine patrol division, that he had occasionally worked there a few years before, and that he was not aware that the defendant had performed any work in the marine patrol.
Milton Barrett testified that he leases the motor pool to the Terrebonne Parish Sheriff’s Department and provides wrecker services. He testified that he occasionally saw the defendant at the motor pool but that the defendant was not working there. On one occasion, Mr. Barrett noticed that, when the defendant brought his patrol unit in to the motor pool for an oil change, it only had 1700 miles on it since the last oil change four to five months before. He testified that normal patrol units were driven four to five thousand miles per month. He testified that he said something to Sheriff Rozands about the matter on one occasion but never followed up on it. When asked if “Zip” Robichaux was the Sheriff’s driver, Mr. Barrett replied that “Zip” Robi-chaux made some trips with the Sheriff but that he would not necessarily characterize him as the Sheriff’s driver.
Larry “Zip” Robichaux testified that he had been employed by the Terrebonne Parish Sheriff’s Office since June 15, 1984. He testified that he knew the defendant but did not know what his duties were. He knew that the defendant had been assigned to the marine patrol but did not know how long. He testified that he assumed the defendant did his job but personally never checked to see what the defendant did. He testified that he did not know the defendant was assigned to the motor pool.
Mr. Robichaux testified that he was a close friend of Sheriff Rozands and was the public relations man for the Sheriff. He testified that he knew the defendant had a unit and was supposed to patrol. He stated that the defendant came to the office and talked with Sheriff Rozands but he did not know the nature of those conversations. He also testified that Sheriff Ro-zands customarily transacted business and received people at his farm and that he had seen the defendant at the Sheriff's farm. He testified that the defendant occasionally *1128 traveled out of town with Sheriff Rozands; and, on one occasion, the three of them went out of town together. Mr. Robichaux testified that he had seen the defendant’s boat once or twice but could not recall whether or not he observed large sheriff's office decals on the side of the boat.
James Williams testified that he was the Justice of the Peace in Gibson and had been so employed for the last eight years. He had previously worked with the Terre-bonne Parish Sheriffs Department from 1967 to 1971 under Sheriffs Prejeant and Rozands. Mr. Williams testified that he knew the defendant because the defendant used to be a constable in Gibson. Although he was aware that the defendant was a deputy sheriff and had a patrol unit, he testified that he had not seen the defendant for approximately two years. However, he testified that, until recently, he had been employed at the Creole Lane Bowling Center and often worked between ten to fifteen hours per day. He also testified that, when not working at the bowling center, he worked six to eight hours per day as the Justice of the Peace.
Mr. Williams testified that, during the last two and one-half years, the only complaint filed with him by the defendant involved criminal damage to the defendant’s property located at the intersection of U.S. 90 and La. 20. He testified that he had never seen the defendant in the patrol unit and that he had never called upon the defendant to assist him. He explained that he did not know what position the defendant held in the Sheriff’s Department and that he always called his constable, Lloyd Gibson, before calling the Sheriff’s Department.
Virginia Nevarez testified that she had been a Terrebonne Parish Sheriff’s Office employee for eight years and had been working in the records section for the last five years. She explained that, when a radio operator received a telephone complaint, the complaint was written on a 3 x 5 index card. She testified that her search of the records revealed a total of seven complaints which the defendant had called in to the Sheriff's Office in Houma.
Ms. Nevarez testified that she lived in Gibson, but she had never seen the defendant patrolling the Gibson area. She testified that, several times a week, she passed the Gator Stop and saw the defendant’s patrol unit parked at his residence. She also testified that she had seen the defendant drinking coffee with Sheriff Rozands at the Sheriff’s Office.
Jill Wallace Loupe testified that, for the last three years, she had been the secretary of the Terrebonne Parish Sheriff’s Office Detective Bureau. After explaining her duties in the Detective Bureau, she testified that, upon being requested to provide all offense reports and complaints filed by the defendant between July, 1984 and December, 1986, she could locate only two. One offense report filed by the defendant concerned a burglary of his residence and the other involved criminal damage to a building owned by him.
Captain Roy Chauvin testified that he worked for the Department of Wildlife and Fisheries and had been so employed for thirteen years. Although he had lived in Gibson for the past seven years, he did not know the defendant and had never seen him before the trial. He testified that he had never seen the defendant patrolling the Gibson area. However, on cross-examination, Captain Chauvin admitted that, since he did not know the defendant, he could have passed the defendant on the road without knowing who he was. On redirect examination, Captain Chauvin testified that, if he had seen the defendant in a patrol unit and spoken to the defendant, he would have remembered such a meeting.
Lloyd Gibson testified that, for the past eight years, he had been the Constable in Gibson. He testified that he defeated the defendant in an election for that position. On one occasion, Constable Gibson complained to Sheriff Rozands that he should have a patrol unit because he patrolled more than the defendant. He testified that, in his opinion, ninety percent of the times that he observed the defendant’s patrol unit, it was parked at the defendant’s home; and on those occasions when the defendant was driving in the patrol unit, he *1129 was not patrolling. He testified that the defendant never assisted him and, on one occasion when he called the defendant for assistance, the defendant informed him to call the Sheriffs Office in Houma. Constable Gibson, testified that the defendant had not presented him with any complaint forms or offense reports and that he was not aware that the defendant had made any arrests. Finally, he testified that he was not aware that the defendant had done any marine patrol work, although he admitted that the defendant could have done so without his knowing about it.
Willy Radau testified that he had been employed by the Terrebonne Parish Sheriff’s Office for nine years. He had been a shift commander under Sheriff Rozands and was currently serving in the Detective Bureau. He testified that he had been aware that the defendant had a patrol unit between July, 1984, and December, 1986; but to his knowledge, he had never seen the defendant patrolling. He testified that he never knew what department the defendant was assigned to and he never saw an offense report filed by the defendant. Detective Radau related that, on one occasion, a deputy had complained to him that the defendant would not assist him as backup. However, Detective Radau could not remember the specific situation or the complaining deputy’s name; and he testified that he never reported the complaint to Sheriff Rozands.
General Smith testified that he had been an employee of the Terrebonne Parish Sheriff’s Office for seven years. He was currently a Captain in charge of the Uniform Division, the position formerly held by Acting Sheriff Larpenter. Between July, 1984 and December, 1986, Captain Smith was an assistant shift supervisor. He and other deputies patrolled the Gibson area during this time. He testified that he never saw the defendant patrolling in the area and was not aware of any law enforcement work done by the defendant.
Lieutenant Ronnie Bergeron testified that he had been employed by the Terre-bonne Parish Sheriff’s Office for nine years and was currently a shift commander. He testified that, between July, 1984 and December, 1986, the defendant was involved in only one complaint handled by his shift. It involved an intoxicated male who was firing a .22 rifle at the Sundown Trailer Park. Lt. Bergeron testified that his personnel did not rely on defendant for assistance as backup and, on several occasions, they called the defendant’s residence but he was either out of town or there was no answer. He testified that he knew the defendant had a patrol unit but did not know that the defendant was drawing a salary. Finally, Lt. Bergeron testified that he occasionally saw the defendant at the motor pool or in the office with Sheriff Rozands.
Horace Witt testified that he had been a Terrebonne Parish Sheriff’s Office employee for over four years. Between July, 1984 and December, 1986, Lt. Witt was a shift commander. He testified that he was not aware of any law enforcement work done by the defendant during this period of time. He testified that his personnel did not rely on the defendant for assistance as backup. However, on cross-examination Lt. Witt testified that, other than the personnel on his shift, he was not aware of what other Sheriff’s Department employees were doing on a day to day basis.
Calvin Jackson testified that he had been a Terrebonne Parish Sheriff’s Office employee for twelve years. Between July, 1984 and December, 1986, he was a detective. As a detective, he had investigated the burglary which occurred at the defendant’s residence. He testified that he knew the defendant had a patrol unit but, other than the burglary investigation, he never saw the defendant patrolling or doing any other law enforcement work.
Lynn Lirette testified that he had been a Terrebonne Parish Sheriff’s Office employee for nine years. Between July, 1984 and December, 1986, he was employed as a narcotics agent. He testified that he had seen the defendant’s patrol unit parked at the defendant’s trailer behind the Gator Stop, but he had never seen the defendant patrolling. He testified that the defendant *1130 had never worked narcotics cases, or any other cases, with him.

Defense Witnesses

Avery Butler, a resident of Gibson for sixty-five years, testified that he had known the defendant a long time and had also known Sheriff Rozands. Mr. Butler testified that he knew the defendant was a deputy sheriff and saw the defendant patrolling the streets of Gibson in his patrol unit. He testified that the defendant came to his house at least four or five times to resolve domestic disputes. Mr. Butler claimed that the defendant patrolled often, both day and night, and also worked with the constable and the justice of the peace. Mr. Butler testified that the defendant patrolled in a boat, directed traffic, performed school security, and assisted other deputies with backup. This testimony conflicted directly with that of the constable and the justice of the peace.
Franklin Cavalier testified that he had been a resident of Gibson for approximately thirteen years. He owned a small grocery store, Cavalier’s Supermarket, which was located in Gibson. Mr. Cavalier testified about two particular occasions when he called the defendant about problems at the store. The first involved a young black man who entered the store with a toy pistol and threatened two black females with it. Mr. Cavalier called the defendant; but, when the defendant arrived approximately fifteen minutes later, the suspect had already left. The defendant investigated the matter, spoke to the suspect’s mother, and returned to inform Mr. Cavalier that the suspect’s mother promised to keep him away from the store. On another occasion, Mr. Cavalier experienced a problem with some “young winos” who stood outside of the store and begged customers for money. Because they were harming his business, Mr. Cavalier called the defendant and asked him if he would circle the store in his patrol unit. Mr. Cavalier testified that the defendant drove to the store, pulled in the driveway, turned around, and departed several times, and that by doing so he solved the problem.
On cross-examination, Mr. Cavalier admitted that he had seen patrol cars in the Gibson area, but he did not know whether the defendant or some other deputy was driving those units. On redirect examination, Mr. Cavalier stated that he had attempted to contact Constable Gibson but was never able to get in touch with him. He stated that everytime he called Constable Gibson on the telephone there was no answer.
Reverend Kinsey Smith testified that he was seventy years old, a lifelong resident of Gibson, and had known the defendant for fifty-five years. He testified that he lived about one and one-half miles from the defendant. Reverend Smith testified that, on two separate occasions, the defendant went to a neighbor’s residence to investigate disturbing the peace complaints. The defendant did not make an arrest either time. Instead, the defendant “talked to them and he squared everything away.” On another occasion, Reverend Smith called the defendant to investigate a shooting at Percey Smith’s cafe. Rev. Smith testified that he also called the Sheriff’s Office in Houma about the shooting, but the defendant arrived on the scene before the detectives.
Rev. Smith further testified that, on one occasion, he observed the defendant, who was in uniform, talking to some people at a house in Peterville. On another occasion, the defendant scolded Rev. Smith for taking a shortcut through the fire station driveway. Finally, Rev. Smith testified that he also observed the defendant directing traffic at the scene of an automobile accident near the defendant’s residence.
Bulah Pontiff testified that she lived in Donner, which is approximately five miles from Gibson. Ms. Pontiff had known the defendant all of her life, and her husband and the defendant were friends. She testified that, on one occasion when she and her husband were having trouble with their son, they called the defendant because they knew he would not hurt their son. When the defendant arrived, their son had left; so the defendant stayed and talked to them about the problem. She testified that, on *1131 another occasion, she called the defendant seeking information about having a person committed. The defendant did not come to her house because he was ill, but he related information about the matter over the phone. Finally, she testified that she saw the defendant on the highway everyday, sometimes in a gray car, a truck, or the patrol unit.
Pamela Toups testified that she lived in Donner on La. 20 and had known the defendant for about twenty years. On one occasion, she called the defendant for assistance because her husband had become intoxicated and began beating her. On similar occasions in the past, she had called the Sheriffs Office in Houma; but they did not help because they referred to the matter as a domestic dispute and informed her to take civil action. However, when she called the defendant, he was able to make her husband stop beating her and leave the premises.
Mrs. Bert Thibodaux testified that she lived on Deadwood Road in Gibson and had known the defendant for five or six years. She testified that, on several occasions, she and her husband had called the defendant for assistance in having the neighbors remove their cars from Deadwood Road. She explained that they owned a motor home and could not pass when neighbors parked their cars in the street. She testified that the defendant did not patrol in a “set pattern” but that, at least twice a day, she observed the defendant’s patrol unit on Deadwood Road. She also testified that she saw the defendant driving through the community in his truck and his personal car.
Roger Songe testified that he had been employed by the Terrebonne Parish Sheriff’s Office as a road patrol deputy from 1985 to April, 1987, when his employment was terminated. He testified that he had seen the defendant patrolling in the Gibson area several times. He also testified that, when he was not on duty, he worked part-time for Barrett Wreckers and towed patrol units and cars of people who had been arrested. On two occasions, he towed the defendant’s old unit to the motor pool. On the first occasion, he found the defendant on La. 20 approximately six or seven miles from the defendant’s home. This incident occurred at approximately 11:00 p.m. The second time he towed the defendant’s patrol unit, it was located on U.S. Highway 90 approximately two miles from the defendant’s home.
On cross-examination, Mr. Songe testified that he had seen the defendant at the motor pool several times when maintenance was being performed on the patrol unit; but the defendant was not doing any work there himself. Mr. Songe testified that shift commanders Witt and Radau had told him that the defendant was a deputy sheriff in the Gibson area and that he could call on the defendant for assistance. Finally, he testified that the defendant was not in uniform on either occasion when his patrol unit broke down.
Wayne Hebert testified that, approximately one year earlier, the defendant had investigated the theft of a three-wheeler belonging to his little brother. Mr. Hebert testified that he was talking on his CB radio with some friends about the theft when the defendant responded over the radio that he was a deputy and would investigate the matter. The defendant came to his house in a truck, and they rode together in the defendant’s truck to a suspect’s house to investigate the theft. However, the three-wheeler was never located.
Marie Fontenot testified that she lived in a trailer on Old Spanish Trail in Gibson. She knew the defendant because he owned the twenty lot trailer park in which she lived. She testified that, in exchange for collecting the rent from the six trailers in the trailer park, the defendant, did not charge rent for her lot. She testified that there was a boat launch directly across the road from her trailer and that she had seen the defendant launching his boat on numerous occasions. She testified that the boat had “big sheriff’s emblems” on its side. Ms. Fontenot stated that she had seen the defendant patrolling in the sheriff’s unit a couple of times and had also seen the sheriff’s unit parked in his driveway. How *1132 ever, she testified that he usually drove one of his personal vehicles.
Myra Oyer testified that she was a resident of Chacahoula, which is approximately six miles from Gibson. She stated that she worked as a cashier at the Gator Stop in Gibson in 1984. She testified that, while working at the Gator Stop, she called the defendant three or four times with various problems. She related one specific incident in which two female customers at the store had been verbally abused by several male customers. She informed the two females to remain in the store while she called the defendant. When he arrived, he talked to the men and threatened to arrest them if they did not leave. Ms. Oyer testified that the men never came' back and that she had no further problems with them. She also testified that the defendant routinely checked in at the store before he went to bed and told her to call him if she experienced any problems.
Max Melerine testified that he lived in Houma and worked as an auto salesman for Porche Motor Company. He testified that he had known the defendant for at least eight years arid had known Sheriff Rozands for approximately forty years. Mr. Melerine testified that he frequently visited the Sheriff at his farm and that he saw the defendant there about twice a week. He testified that he sometimes saw the defendant and Sheriff Rozands leave the farm together in the Sheriffs Cadillac. On one or two occasions, he saw them leave in the defendant’s personal vehicle. He knew that they were going out of town, but he was not sure where they were going.
The defendant, Roy H. Jones, testified that he was sixty-nine years old at the time of the instant trial, which took place on September 28, 29, 30, and October 1, 1987. He was a decorated veteran of World War II and had been in law enforcement since 1954, when he was appointed a special deputy by Sheriff T.P. Prejean. He was the Constable in Gibson from 1972 to 1980 and was defeated in the 1980 election by the present Constable, Lloyd Gibson. Between 1980 and 1984, the defendant was not involved in law enforcement. After Sheriff Rozands was re-elected in 1984, the defendant was commissioned as a deputy by Sheriff Duplantis approximately one month before Sheriff Rozands took office. The defendant testified that he did not receive a salary until July 1, 1984, when Sheriff Ro-zands took office. He testified that he had been a friend of Sheriff Rozands for approximately forty years. The defendant was also a political supporter of Sheriff Rozands, who once ran for the office of Sheriff against the current District Attorney, Douglas Greenburg, among others.
The defendant testified that he was paid every two weeks from July, 1984, until he was “laid off” in April, 1987, on the day after Sheriff Rozands was buried. The defendant stated that he was told his employment was being terminated “for financial reasons.” The defendant explained that he worked for Sheriff Rozands only, and that Sheriff Rozands never instructed him to work at the motor pool as a mechanic or in the marine patrol. He testified that he took orders only from Sheriff Rozands and never went to the Sheriff’s Office to look at the books and see where he was listed on the payroll records. When he was commissioned as a deputy sheriff, he informed Sheriff Rozands of the duties he had performed as a constable. He testified that Sheriff Rozands instructed him to perform the same duties, as well as additional duties, as instructed by the Sheriff. After approximately one year, the defendant was assigned an old patrol unit (unit 104). A short time later, this unit broke down and was sold by the Sheriff’s Department. It was replaced with another old unit (unit 217), which also broke down frequently. The defendant testified that he often left unit 217 parked at his home for visibility purposes, i.e., it acted as a deterrent. He believed that unit 217 had been towed in for repairs three times and testified that he continued to use his personal vehicles to perform his duties.
The defendant testified that, between July, 1984, and December, 1986, he trav-elled out of town with Sheriff Rozands almost every week. He testified that these trips involved Sheriff’s Office business in *1133 Baton Rouge and several other locations. He made such trips with Sheriff Rozands in the Sheriffs Cadillac and in his own personal vehicle. The defendant also testified that, upon specific instructions by Sheriff Rozands, the defendant occasionally made out of town business trips alone.
The defendant testified about many of the services he performed as a deputy sheriff between July, 1984, and December, 1986. Most of the incidents involving complaints and offenses had previously been related by various defense witnesses. The defendant also related an incident involving an elderly lady who returned to her trailer at approximately 2:00 o’clock in the morning and found the trailer door ajar. She summoned the defendant; and, although it was the middle of the night, the defendant entered her trailer and made sure that no one was hiding inside. He also recounted incidents about loose dogs which were causing property damage, and incidents about transients and trespassers.
The defendant testified that he owned a boat which he used to patrol the waters around the Gibson area. He testified that the boat had large, Sheriffs Department decals on each side and smaller decals on the windshield and the rear of the boat. He also testified that the boat had a police radio which had been installed at the motor pool. The defendant used this boat to investigate a camp burglary and, on another occasion, to investigate a complaint by some fishermen about several loose barges which were blocking a canal.
The defendant testified that he often visited Sheriff Rozands at the Sheriffs farm outside of Houma. He explained that Sheriff Rozands often cooked breakfast at the farm and conducted Sheriffs Office business there. Finally, the defendant explained that Sheriff Rozands had given him permission to have business cards. The defendant stated that Sheriff Rozands informed him to place upon the business cards: “Deputy Roy Jones, Assistant to Charlton P. Rozands.”
On cross-examination, the defendant admitted that Sheriff Rozands had never issued written orders or memoranda about the defendant’s position and duties. He stated that his instructions and orders from Sheriff Rozands were always communicated verbally. When questioned about his business interest in the Gator Stop convenience store located at the intersection of U.S. Highway 90 and La. 20, the defendant explained that he did not own the property at that location. He stated that he owned the improvements on that property and leased them to Mr. Ziegler in exchange for a rental fee. Finally, the defendant stated that, by rendering first aid to victims of traffic accidents, he had been credited with saving three lives.

State Witnesses on Rebuttal

Thibodaux Police Officer Silas Theriot testified that he had been previously employed by the Terrebonne Parish Sheriff’s Office between October, 1984, and August, 1985, as a road patrol deputy. Officer Theriot stated that he patrolled the Schriever and Gibson areas on his shift. He testified that the defendant never assisted him as backup and that he had never seen the defendant’s patrol unit on the streets or parked at the defendant’s residence. However, he also stated that he did not know the defendant. On cross-examination, Officer Theriot explained that his patrol area actually extended from Shriever to Gray, then back through Schriever on U.S. Highway 90 to the St. Mary Parish line. He also admitted that he never called upon the defendant because he never knew who the defendant was. On redirect examination, he testified that he was never advised by a shift commander that the defendant was available to assist as backup.
James Brown testified that he had been employed by the Terrebonne Parish Sheriff’s Office as a full-time deputy since June, 1987. He had been a part-time deputy sheriff from 1981 until June, 1987. He testified that he had lived in Chacahoula for the past nineteen years and that he had known the defendant since the defendant had been a constable. Deputy Brown testified that he was the Neighborhood Watch Director for Donner, Chacahoula, and Gibson and that the defendant had not been a *1134 member of Neighborhood Watch between July, 1984, and December, 1986. He testified that he had never seen the defendant directing traffic, assisting the fire department, or assisting injured people at the scene of an accident. He also testified that the defendant had never assisted him in handling a complaint or offense, nor had he been advised that the defendant was available to assist as backup.
Vince Bourgeois testified that he lived in Gibson and was the Chief of the Gibson Volunteer Fire Department. He testified that he had known the defendant for approximately twenty-three years and was once employed by the defendant at the defendant’s service station. He testified that, between July, 1984, and December, 1986, he passed by the defendant’s residence at least twice a day and he saw the defendant’s patrol unit parked there on the average of twice a day. He also testified that he had never seen the defendant driving his patrol unit and that the patrol unit was covered with dust.
Mr. Bourgeois testified that in August, 1986, there had been a serious traffic accident right behind the defendant’s residence; but the defendant did not come out of his trailer until after a helicopter attempted to land in the middle of the highway. Mr. Bourgeois testified that the helicopter was forced to land approximately a quarter of a mile from the accident; and, after picking up the victim, the helicopter stirred up a large amount of dust. According to Mr. Bourgeois, the defendant came out of his trailer and complained about the amount of dust stirred up by the helicopter. He testified that the defendant did not assist in directing traffic or in rendering emergency aid to the victim.
Mr. Bourgeois testified that he had seen other sheriffs deputies patrolling the Gibson area, but he never saw the defendant assisting them as backup. He also testified that, to his knowledge, the defendant had not performed any marine patrol or rescue duties in his boat. Finally, Mr. Bourgeois related that, approximately one week before the trial, the defendant had contacted him and requested him to testify on behalf of the defendant at the trial. According to Mr. Bourgeois, the defendant wanted him to testify that, in the past, the defendant had aided victims of traffic accidents by applying first aid until help arrived. Mr. Bourgeois replied that he had never seen the defendant perform first aid at an accident and, therefore, would not testify on his behalf at the trial.
The state was required to prove that the defendant had committed public payroll fraud. In doing so, the state was required to prove that the defendant’s services were grossly inadequate for the compensation received. The state did not contend that the defendant had done absolutely no work as a deputy.
Although there was copious amounts of testimony on the issue of whether the defendant adequately provided services to the sheriff and the public, it is quite clear that whatever the defendant did, he did so at his leisure and without any scrutiny from an immediate superior. Under the guidelines of LSA-R.S. 33:1422(A), a sheriff is authorized to pay the salaries of deputies in his department. Inherent in this authorization is the obligation that the sheriff receive adequate services from these deputies and also that he faithfully discharge the financial duties of sheriff as the officer in charge of the public tax monies. The public payroll fraud statute has existed in this state in one form or another since 1873. It is commonly known as the dead-head statute in that it prohibits those in charge of hiring someone and paying them, without the public receiving a benefit from the expenditure of these monies. A person on a public payroll must at least meet the requirement of providing services that are above the grossly inadequate threshold. In State v. Gisclair, 363 So.2d 696, 698 (La.1978), the Louisiana Supreme Court declared that the language of LSA-R.S. 14:138, “offers a clear and definite standard of conduct.”
After hearing all of the testimony presented, the jury returned a verdict of guilty on the public payroll fraud charge. We cannot say that the jury incorrectly decided the evidence presented to it. The *1135 jury was aware that the defendant was a commissioned deputy, was assigned a patrol car, and was on the payroll as such. However, it decided that the services rendered by the defendant were grossly inadequate for the compensation he received. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984.)
The trier of fact may accept or reject, in whole or in part, the testimony of any witnesses). State v. Robinson, 525 So.2d 708 (La.App. 1st Cir.1988). As this court stated in State v. Mullins, 464 So.2d 459, 461 (La.App. 1st Cir.1985):
In State v. Mathews, 375 So.2d 1165 (La.1979), a majority of the Louisiana Supreme Court determined that the United States Supreme Court case of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) required that the standard of review when considering the sufficiency of the evidence to support a criminal conviction is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This standard for the appellate review of facts in criminal cases has been made statutory. La.C.Cr.P. art. 821; State v. Captville, 448 So.2d 676 (La.1984); State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983).
In review of the evidence and testimony before this court, we conclude that the jury’s decision to convict the defendant of public payroll fraud is supported by the record and passes the constitutional muster of Jackson and LSA-R.S. 15:438. The record supports a finding that the defendant provided very few, if any, official services for his salary. One cannot provide services which are adequate to crest the threshold of “grossly inadequate,” when the majority, if not all, of the defendant’s peers and superiors knew little of his dutíés other than a few visits with the sheriff and an occasional drive in his patrol unit. The conviction of payroll fraud is hereby affirmed.
THEFT CONVICTION
Defendant also complains on appeal that there was insufficient evidence to support his conviction of theft. As stated, the defendant was charged with violation of LSA-R.S. 14:67, or theft of $4,101.61 belonging to the Terrebonne Sheriff’s Department.
State Exhibit 3 consisted of four folders containing approximately two hundred seventy-one gasoline credit card receipts. These receipts were examined by Robert Foley, a handwriting analysis expert. He testified that approximately two hundred sixty-four of the receipts had been signed by the defendant. One of the receipts had not been signed. Although the remaining six receipts had the defendant’s name on them, Mr. Foley testified that the signature was not that of the defendant.
Vincent LaMartina, the manager of the Department of Public Safety Motor Vehicle Office in Terrebonne Parish, and Investigator Mosely testified about the different license plate numbers and vehicles listed on the gasoline credit card receipts charged by the defendant. Mr. LaMartina testified that the Motor Vehicle Office records indicated four vehicles were currently registered in the defendant’s name. Yet, Mr. Mosely testified that there were credit card receipts for charges of gasoline to twenty-one private vehicles, two police units, and one boat. The boat belonged to the defendant; and the two patrol units (unit 104 and unit 217) had been assigned to the defendant. In addition to the four vehicles registered to the defendant (a 1983 Cadillac, a 1986 Mercedes, a 1983 Camaro, and a 1975 Mercedes) another vehicle, a 1985 Mercedes, had previously been owned by the defendant. Approximately $40.00 had been charged to a cancelled license plate, number 139C804. Over $600.00 had been charged to license plate numbers 46X796 and 426X496. However, there was no record on file for these two license plate numbers. There was one $17.00 charge to *1136 a Texas temporary license plate and approximately $65.00 in charges to four license plates which had not yet been issued. A total of $2,994.16 in gasoline was purchased by the defendant inside Terrebonne Parish and $1,107.45 in gasoline was charged by the defendant outside Terre-bonne Parish. A total of $910.85 was charged to the defendant’s two patrol units both inside and outside of Terrebonne Parish. At least eight gasoline receipts had the license plate numbers of vehicles which were currently registered to other people and had never been owned by the defendant. The owners of several of these vehicles testified that they did not know the defendant and did not authorize him to charge gasoline to their vehicles.
Sheriff Larpenter testified that, before a road patrol deputy could use a Terrebonne Parish Sheriff's Office gasoline credit card, such use had to be authorized by a shift commander. He also testified that, to his knowledge, no one was allowed to charge gasoline to the Sheriffs Office for their private use. Shift commander Radau testified that road patrol deputies usually did not have Sheriffs Office gasoline credit cards. He also stated that the use of Sheriffs Office gasoline credit cards was restricted to Sheriffs Office vehicles being driven in the performance of official business. Shift commander Witt and assistant shift supervisor Smith also testified that shift commanders, not regular road patrol deputies, usually had Terrebonne Parish Sheriffs Office gasoline credit cards. They also testified that such credit cards were for emergency use only.
The defendant testified that, during his first year as a deputy sheriff and before unit 104 had been assigned to him, Sheriff Rozands instructed him to patrol in his personal vehicles. The Sheriff also told him to go to the Sheriffs Office and pick up some Terrebonne Parish Sheriffs Office gasoline credit cards. When the two patrol units were assigned to him, the defendant continued to use these gasoline credit cards to purchase gasoline for the patrol units and for his personal units when the patrol units were inoperable. He testified that Sheriff Rozands knew that he was using these credit cards to purchase gasoline.
The defendant testified that he frequently traveled out of town on Sheriffs Office business, often with Sheriff Rozands. Mr. Barrett and “Zip” Robiehaux previously testified that the defendant sometimes traveled out of town with Sheriff Rozands. However, on cross-examination, the prosecutor asked the defendant to explain the numerous purchases of gasoline outside Terrebonne Parish. For instance, there were twenty-two gasoline receipts from Denham Springs alone. Not counting the purchases of gasoline inside Terrebonne Parish or in Thibodaux, there were a total of sixty gasoline receipts. In addition to the twenty-two receipts from Denham Springs, there were ten from Baton Rouge; five from Crowley; four each from Vinton and Lafayette; three each from Sulphur and Lake Charles; two each from Jennings and Hammond; and one each from Welsh, Morgan City, Avondale, Mandeville, and Des Allemands. The above sixty gasoline receipts from these locations outside Terre-bonne Parish, excluding Thibodaux, totaled approximately $887.00.
The defendant denied using these credit cards to purchase gasoline for his personal use. He explained that, when he used them to purchase gasoline for his personal vehicles, he was conducting official business. When questioned about the gasoline purchases outside Terrebonne Parish, he stated that he had been travelling on official business, usually with Sheriff Rozands, when he used the credit cards to purchase gasoline at each of the above locations. When questioned about the numerous different license plate numbers on these charge receipts, the defendant explained that they might have been written down incorrectly.
The numerous gasoline receipts introduced into evidence in State exhibit 3 proved that the defendant put gasoline into private vehicles in many different locations. He either used all of this gasoline for official business or he did not; these are the only two possibilities. In finding the defendant guilty of theft of $500.00 or more, the *1137 jury obviously rejected the defendant’s explanation of these gasoline purchases with the use of Terrebonne Parish Sheriffs Office credit cards. We believe that a rational trier of fact, viewing all of the evidence as favorably to the prosecution as any rational factfinder can, could have concluded that the State proved beyond a reasonable doubt that the defendant was guilty of theft of $500.00 or more. See State v. Mussall, 523 So.2d 1305 (La.1988); see also State v. Captville, 448 So.2d 676 (La.1984).
These assignments of error are merit-less.
In his appeal, the defendant has assigned sixteen assignments of error, most of which have been dealt with the preceding discussion.
DISCUSSION OF ASSIGNMENTS OF ERROR NUMBERS ONE, FOUR, TEN, FOURTEEN AND FIFTEEN
In these assignments defendant argues that the bill of information charging defendant with theft was defective and that the evidence fails to support the conviction. Defendant argues that the general allegation of theft as described by LSA-R. S. 14:67 is improper as he should have been charged with theft of gasoline and oil or unauthorized use of an access card. If a defendant is charged by a short form bill of information, he is entitled to obtain the details through a bill of particular. See State v. Abney, 347 So.2d 498 (La.1977), State v. Gainey, 376 So.2d 1240 (La.1979).
As early as August, 1987, the defendant was on notice that the state intended to use the Sheriffs Department gasoline and credit card invoices to prove the allegations of theft. The statutory definition of theft in LSA-R.S. 14:67 is broad enough to cover the circumstances of defendant’s use of the credit cards. It is the general rule that such minor differences between a bill of information and the crime actually charged with are harmless, unless the defendant is prejudiced. State v. James, 305 So.2d 514 (La.1974), State v. Pichler, 355 So.2d 1302 (La.1978). We find no prejudice here. The testimony and evidence presented at trial supports the conviction of theft of $4,101.61 from the Sheriff’s Department and the denial of defendant’s motion in arrest of judgment.
ASSIGNMENTS OF ERROR NUMBERS TWO, THREE, THIRTEEN AND SIXTEEN
These assignments pertain to the conviction of public payroll fraud and alleged Brady[2] material that was withheld from defendant. In his supplemental motion for a new trial, defendant alleged that the district attorney failed to supply defendant with information from Captain Roland Acosta, which indicated that the defendant occasionally assisted Acosta in locating property to be seized. Under the rule of Brady, the evidence in question must be exculpatory. In the landmark case of United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court indicated that short of a specific request for particular exculpatory evidence, a district attorney is not obligated to provide Brady material to a defendant who is aware of the material already. In the present case, the defendant was aware that he had helped Captain Acosta, but failed to even mention this on direct or cross-examination. We cannot impute to the district attorney the failure of the defendant to announce information favorable to him. Captain Acosta was in court and could have testified; the defendant could have subpoenaed him as a defense witness. This failure by defendant is not violative of his constitutional right to due process. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish “materiality” in the constitutional sense. Agurs, 96 S.Ct. at 2400.
The remaining assignments wrestle with the issue of the sufficiency of evidence to support his conviction of public payroll fraud. For the foregoing reasons and discussion, we find the record clearly supports this conviction.
*1138 ASSIGNMENT OF ERROR NUMBER FIVE
This assignment is without merit. The juror in question knew both the district attorney as well as the defense attorney, Mr. Keith Whipple. After questioning this juror, the trial judge concluded that the juror would be fair and impartial; we find no error.
ASSIGNMENT OF ERROR NUMBER SIX
Defendant was asked by defense counsel what Sheriff Rozands had ordered defendant to do as far as his official duties were concerned. The prosecutor objected to the question as it was soliciting hearsay. The trial judge sustained the objection. We find no error here. The defendant was attempting to offer an out of court statement as an assertion to show the truth of matters asserted therein. LSA-R.S. 15:434, 463. This assignment is without merit.
ASSIGNMENT OF ERROR NUMBER SEVEN
The defendant’s attempt in having his expert witness, Murray Landry, give a value to the services actually rendered by the defendant, was properly denied by the trial judge. It was for the jury to decide if the services rendered were grossly inadequate; they found just that. This assignment is without merit.
ASSIGNMENT OF ERROR NUMBER EIGHT
The trial judge also properly refused to declare a mistrial based upon the alleged reference by the prosecutor of the defendant’s planned refusal to testify. In reviewing the record before this court, we find absolutely no implication of this allegation within the prosecutor’s remarks that merit any further discussion. This assignment is also without merit.
Upon complete review of the record before us, we find that the defendant’s convictions and sentences are based upon evidence sufficient to overcome the constitutional guidelines set forth in Jackson v. Virginia, supra.
ASSIGNMENT OF ERROR NUMBER NINE
When two jurors were approached by an unknown male in the courtroom hall during a recess asking that they find the defendant not guilty they notified the bailiff. The trial judge questioned the jurors who indicated they were not affected by the encounter. We find no error here. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER TWELVE
This assignment is without merit. The issue of the constitutionality of LSA-R.S. 14:138° was discussed in State v. Gisclair, 363 So.2d 696 (La.1978).
It is quite clear that the defendant was a specially appointed “deputy” with little or no responsibilities to the department or to the public of whom he was there to serve. To collect a public salary and to charge unwarranted purchases, without providing substantial services, is a gross violation of the public trust placed in both a sheriff and his appointed deputies.
For the above reasons, the defendant, Roy H. Jones’ convictions and sentences are affirmed as rendered.
AFFIRMED.
SAVOIE, J., dissents in part and assigns reasons.

. For the payroll fraud conviction, the defendant received a sentence of two years at hard labor. For the conviction of theft of $500.00 or more, the defendant received a sentence of five years at hard labor. The trial court imposed the sentences to run concurrently, suspended both sentences, and placed the defendant on five years supervised probation upon the condition that he serve one year imprisonment at hard labor. The trial court also imposed the following special conditions of probation:
1. The defendant must refrain from criminal conduct.
2. The defendant must pay a $1,000.00 fine and court costs of $3,111.44.
3. The defendant must report to the Probation Office within twenty-four hours upon being released from prison.
4. The defendant must comply with all lawful conditions of probation.
5. The defendant must make restitution to the Terrebonne Parish Sheriffs Office in the amount of $18,850.00 (for the amount of salary received under Count No. 1) and $4,101.61 (for the amount of gasoline credit card charges under Count No. 2). Said sums are to be paid over a five year period through the Probation and Parole Office. The trial court ordered that the probation supervision fee is $15.00 per month and that the fine and court costs are payable upon the defendant’s release from prison.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).